# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**CLAUDIA JEAN GARDNER,**

      **Plaintiff,**  CIVIL ACTION NO. 2:06-14936

vs.

      **DISTRICT JUDGE DENISE PAGE HOOD**

**COMMISSIONER OF**     **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

      **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**RECOMMENDATION:** This Court recommends that Defendant's Motion for Summary Judgment be GRANTED, that Plaintiff's Motion for Summary Judgment be DENIED, and that Plaintiff's Complaint be DISMISSED, as there was substantial evidence on the record that Plaintiff remained capable of performing a significant number of jobs in the economy.

\*\*\*

Plaintiff filed applications for Disability and Disability Insurance Benefits and Supplemental Security Income on April 20, 2004, alleging that she had been disabled and unable to work since June 13, 2001 due to chronic bilateral knee pain and symptoms of recurrent depression and anxiety. (TR 43, 63). The Social Security Administration denied benefits. (TR 37). A requested *de novo* hearing was held on June 14, 2005 before Administrative Law Judge (ALJ) Jerome B. Blum who subsequently found that the claimant was not entitled to a period of disability, Disability Insurance Benefits or Supplemental Security Income because she was not under a disability at any time through the date of his February 24, 2006 decision. (TR 23, 170). The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review. (TR

6). The parties filed Motions for Summary Judgment and the issue for review is whether Defendant's denial of benefits and supplemental income was supported by substantial evidence on the record.

Plaintiff was fifty years old at the time of the administrative hearing, completed two years of college and had worked as a special education paraprofessional from August 1980 to June 2001. (TR 51, 60, 66, 172, 173). Plaintiff has not engaged in any substantial gainful activity since 2001. (TR 22). Plaintiff testified that before she left her job she was under a great deal of stress and was having a hard time getting along with the teacher with whom she worked. (TR 175). She testified that she had a nervous breakdown, took a leave of absence and did not return to work. (TR 176). In her Disability Report Plaintiff reported that she suffers from emotional and mental problems, including flashbacks and alleges that "voices talk" to her. (TR 50). She reported that she has not been seen by a doctor, hospital or clinic for these conditions but that she needs to see somebody to help her. (TR 52). Plaintiff reported a childhood history of sexual abuse; she alleges that on May 20, 1970 she was treated at the Detroit Psychiatric Institute as a result of her attempt to kill a family member connected with the abuse. (TR 53, 155).

Plaintiff reported that she has been treated since June 2001 for bone spurs in both ankles, which cause her pain. (TR 52). She also reports hospital and doctor visits from January to March 2004 as a result of falling at a retail store and injuring her lower back, shoulder and both knees. (TR 52, 53, 175). She reports that these injuries were treated with pain pills, muscle relaxers and physical therapy. (TR 52).

In a Field Office Disability Report dated April 20, 2004 the interviewer that Plaintiff was "pleasant, cooperative, and able to answer all questions with ease. No obvious signs of a disabling

condition detected over the phone." (TR 64). In a Michigan Disability Determination Service Function Report dated May 25, 2004 Plaintiff reported that she takes care of her dogs, including bathing them and taking them out to her backyard. (TR 78-85, 145). She reported that she used to be able to take the dogs on long walks or to the park and she used to bicycle, race walk and exercise at a gym but she cannot do these activities anymore. (TR 79). She has trouble bathing and dressing because it hurts her back, knees and ankles. She reported that she sometimes does not get to the toilet on time and wets herself because she cannot walk fast enough. (TR 80). She alleges that she needs reminders to shower, eat and take her medicine. (TR 80). She is able to microwave meals but does not cook on the stove because she will forget that she is cooking and burn her food. (TR 80). Plaintiff reports that she has problems paying attention, concentrating, remaining focused and remembering things. (TR 84, 177). She reports that her sleep is affected by hearing voices at night that "want to kill" her and keep her awake. (TR 79). She testified at the hearing that she has had multiple suicide attempts. (TR 180).

Plaintiff reports that she is able to drive, however, someone stole her car. (TR 81). She later testified that she doesn't drive because she was in an accident and now she's afraid to drive. (TR 182). Housework and yard work hurt her lower back, ankles and knees. (TR 81). She responded that she does not "remember how to count money," however, she can pay bills, handle a savings account and use a checkbook and money orders. (TR 82). Plaintiff attends church twice a week, listens to music every day and has hobbies including traveling, playing board games, watching sports, going to the beach, park and plays and reading. (TR 82). She reports that she is now depressed and does not want to do anything. (TR 82). Plaintiff testified at the hearing that the electricity and the heat at her house have been shut off. (TR 177).

Plaintiff reports that her conditions affect her abilities to do all of the activities listed in her Function Report except "talking." (TR 83). These include lifting, squatting, standing, reaching, walking, using hands, sitting, seeing, climbing stairs, hearing and kneeling. (TR 83). Plaintiff reports using orthotics, a cane, a brace or splint and wearing glasses and/or contact lenses. (TR 83). She does not remember the name of the doctors who prescribed these and testified at the hearing that the brace was prescribed by a doctor but the cane was not. (TR 83, 179). Plaintiff further testified that she cannot stand for long periods of time. (TR 178).

Plaintiff reports to have been treated for depression and arthritis by Dr. Jones at Professional Medical Center. (TR 86). Dr. Jones prescribed Naproxen and Tramadol. (TR 86, 87). Plaintiff testified that the medication she takes for her emotional problems, including Seroquel and Prozac, seem to help and she is "a little better." (TR 187). Plaintiff further testified that she walks two blocks to see Dr. Kole for her knees and back. (TR 188). The record does not contain evidence from Dr. Kole.

**Medical Records and Assessments**

A Physical Residual Functional Capacity Assessment dated July 26, 2004 notes a primary diagnosis of bilateral knee pain, a secondary diagnosis of low back pain and an additional impairment of ankle surgery. (TR 90-97). The following exertional limitations were assessed: Occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; and unlimited ability to push and/or pull (including operation of hand and/or foot controls). (TR 91). It is also noted that Plaintiff uses a cane when her knee pain is severe, is able to ambulate without the cane and is "able to walk one block" (TR 91-92). An exam

revealed that Plaintiff's right knee exhibited tenderness, warmth and effusion. (TR 92). A June 2004 x-ray of Plaintiff's knees was noted as "normal." (TR 92).

On August 12, 2004 James Tripp, Ed.D., psychologist diagnosed Plaintiff with dysthymia disorder and intermittent explosive disorder with a GAF of 65. (TR 102, 105, 109). Under "Functional Limitations" Dr. Tripp noted no episodes of decompensation and only "mild" restriction of activities of daily living, difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace. (TR 112). In a Mental Residual Functional Capacity Assessment dated August 12, 2004 Dr. Tripp notes that Plaintiff is "moderately limited" in the ability to understand, remember and carry out detailed instructions. (TR 98). These were the only limitations noted in the assessment areas, which include understanding and memory, sustained concentration and persistence, social interaction and adaption. (TR 98). Dr. Tripp found that the remaining mental activities were "not significantly limited." (TR 98).

Plaintiff saw Gary S. Kaplan, D.P.M., five times from August 23, 2001 to September 28, 2001 complaining of pain in the "outerside" of both feet. (TR 116). Plaintiff reported that she underwent a foot surgery bone graft at age eight and had no problems with her feet until 1994 after she fell over a dolly at a retail store. (TR 118). Plaintiff reported arthritis in her knees and feet and Dr. Kaplan made a preliminary diagnosis of "arthritis inflamed talo cal jt lymphedema heel spur with plantar fascitis." (TR 117, 118). Dr. Kaplan treated Plaintiff with injections. (TR 116). At each of the examinations following the initial exam on August 23, 2001 Plaintiff noted either that the treatments were helping or that she was experiencing less pain. (TR 116).

Plaintiff went to a hospital on January 7, 2004 complaining of pain in both knees, her right shoulder and upper back after slipping and falling on a wet floor at a store. (TR 120). Plaintiff was

diagnosed with an avulsion fracture to the right distal femur. (TR 123). An x-ray revealed Plaintiff's left knee was normal, with no traumatic or intrinsic osseous, articular, or soft tissue abnormalities. (TR 124). An x-ray of the right knee revealed an old MCL injury. (TR 125). There was otherwise no evidence of acute fracture or dislocation of the right knee. (TR 125). An x-ray of the right shoulder revealed "[n]o traumatic or intrinsic osseous, articular, or soft tissue abnormalities." (TR 126). Her knee was immobilized and she was directed to use crutches. (TR 123). Plaintiff was prescribed Tylenol 3 and discharged. (TR 123).

Plaintiff underwent an internal medical evaluation on June 25, 2004 by P. Patel, M.D. (TR 129). Plaintiff complained of swelling and constant pain in both knees, numbness and tingling in her legs, pain and swelling in her ankles and constant lower back pain. (TR 129). Plaintiff used a cane at the evaluation and wore a knee brace. (TR 129). Plaintiff reported that she can walk approximately one block. (TR 129). Plaintiff reported that she had x-rays of her knees and back, but no MRI. (TR 129). Dr. Patel noted normal range of motion for Plaintiff's cervical spine, elbows, hips, wrists, MP, PIP and DIP joints. (TR 130). Plaintiff was able to ambulate without the cane, however, she was unable to tandem gait or walk on her toes or heels. (TR 130). The rate of her gait was slightly improved with the cane. (TR 130). Dr. Patel concluded that she has crepitus in both knee joints and tenderness, warmth and an effusion in the right knee joint. (TR 130). He further concluded that she suffers from lower back pain. (TR 131).

On June 25, 2004 Plaintiff also had x-rays taken of her knees and cervical spine. (TR 131). The radiologist, Herb Weisenthal, D.O. noted about the knees that the osseous structures were within normal limits, "articular structures are well preserved," there was "[n]o evidence of fracture, dislocation, osteoblastic or osteolytic activity" and that "soft tissue structures are unremarkable."

(TR 132). Dr. Weisenthal noted of the cervical spine that there is "narrowing at C4-C5, C5-C6 and C6-C7 disc space with spurring and sclerosis of the adjacent articular surface." (TR 132). He further noted "[n]o evidence of fracture, dislocation, blastic, or lytic change is noted. The remainder of the intervertebral disc spaces appear well preserved." (TR 132). He diagnosed degenerative disc disease at C4-C5, C5-C6 and C6-C7 levels. (TR 132).

B. Baddigam, M.D. performed a psychiatric evaluation of Plaintiff on June 25, 2004. (TR 135). Dr. Baddigam made the following diagnoses: Axis I: intermittent explosive disorder and dysthymic disorder; Axis II: deferred; Axis III: back pain, bilateral knee pain and no arches in bilateral feet; Axis IV: psychosocial stressors - moderate; and Axis V: GAF - 65. (TR 136). Dr. Baddigam noted that Plaintiff was superficially cooperative, her affect was appropriate to thought content and her mood was calm. (TR 135). Dr. Baddigam noted that Plaintiff walked with a slight limp and used a cane, her grooming and hygiene were fair and she avoided eye contact. (TR 135). Dr. Baddigam also noted that Plaintiff reported that she lives alone, gets along fairly well with family, has few friends and has limited contact with neighbors. (TR 135). He further noted that she was "superficially cooperative and vague during the interview" and "appears to be exaggerating her symptoms." (TR 135).

On January 24, 2005 Plaintiff underwent a Psychiatric Evaluation at North Central Health Clinic with G. Sadasivan, M.D. (TR 153). Plaintiff complained of hearing voices, having mood swings, problems sleeping and nightmares and seeing visions "of animals and people who are strange." (TR 153). Dr. Sadasivan noted that Plaintiff's speech was normal but her answers were unreliable and "change each time you ask." (TR 153). Dr. Sadasivan noted that Plaintiff has auditory hallucinations and hears voices of people telling her to kill herself and do dangerous things

to others, but Plaintiff has "no plans to do these at this time." (TR 153). Plaintiff reported that she has been on medication for her arthritis, but Dr. Sadasivan noted that Plaintiff was not on any medication for her psychiatric issues at that time and had not been "on any medication for the past 25 years." (TR 154). He noted that her prognosis might be "fair once she starts on medication and she is stabilized with ongoing treatment." (TR 154). He prescribed Seroquel and Desyrel to control her hallucinations and delusions. (TR 154). He recommended hospitalizing Plaintiff to "stabilize her because she is not reliable and she is noncompliant and she may forget to take medications." (TR 154). Dr. Sadasivan diagnosed Plaintiff with the following: Axis I: Post traumatic stress disorder with psychotic features, rule out bipolar disorder mixed, mood disorder due to drug abuse and mood disorder due to head injury; Axis II: Avoidant personality disorder; Axis III: Arthritis, status post surgery of both feet for absence of arch bone, history of head injury; Axis IV: lack of power and gas in house, no income or job, financial stress; Axis V: GAF 35-40. (TR 154).

On March 3, 2005 Plaintiff underwent a Nursing Assessment at North Central Health Center. (TR 149). Plaintiff reported seeking services to "stop hearing voices and sleep at night." (TR 149). Plaintiff also reported anger problems. (TR 152). On March 31, 2005 Plaintiff underwent a Case Management Assessment at North Central Health Center. (TR 141). Plaintiff complained of hearing voices and seeing "things that aren't real." (TR 141). Plaintiff was noted as being "fully independent" in activities of daily living with the exception of mobility and housework, with which she was noted "dependent/requires assistance." (TR 142). Plaintiff reported that she is involved with her friends, family and church. (TR 144). She also reported that she has no insurance or income, her utilities had been turned off and she receives assistance from her pastor and a best friend. (TR 142-45).

**ADMINISTRATIVE LAW JUDGE'S DETERMINATION**

The ALJ found that although Plaintiff met the disability insured status requirements, had not engaged in substantial gainful activity since 2001, and suffered from degenerative arthritis affecting her knees and neck and mental impairments including post-traumatic stress disorder with psychotic features, dysthymic disorder, intermittent explosive disorder, avoidant personality disorder and possible bipolar disorder, she did not have an impairment or combination of impairments that met or equaled the Listing of Impairments. (TR 22). Additionally, the ALJ found Plaintiff's testimony was not totally credible, she could not perform her past relevant work and her exertional limitations do not allow her to perform the full range of sedentary work, but concluded that she was capable of performing a significant number of sedentary jobs in the economy. (TR 23). Therefore she was not suffering from a disability under the Social Security Act. (TR 23).

**STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health*

*and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Commissioner*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

## **DISCUSSION AND ANALYSIS**

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1) she was not presently engaged in substantial gainful employment; and

(2) she suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) she did not have the residual functional capacity to perform her relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her RFC, age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *Id*. § 404.1520(f). The Commissioner has the burden of proof only

on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987).

Plaintiff argues that the decision of the ALJ is not supported by substantial evidence because the ALJ failed to address all of the medical evidence in the record. Plaintiff contends that the ALJ's finding that there were significant number of jobs in the economy which Plaintiff could perform was not supported by substantial evidence. Further, Plaintiff contends that the ALJ failed to follow the mandates of Social Security Rulings ("SSR") 96-6p and 96-7p. Plaintiff argues that she is entitled to an award of benefits as of her alleged onset date of June 13, 2001. For the following reasons, the Court is persuaded that the decision of the ALJ was supported by substantial evidence.

***Whether the ALJ Erred in Failing to Address All of the Medical Evidence in the Record***

Plaintiff's first argument is that ALJ failed to mention evidence showing that Plaintiff suffers from inflamed talo calc joint causing bilateral pain in her feet, lymphedema and ankle. (Pl.'s Br. at 9). Plaintiff specifically refers to records from Dr. Kaplan. Plaintiff also alleges that the ALJ mentioned a one time consultative exam diagnosing a GAF of 65 for Plaintiff, yet did not mention that Plaintiff's treating psychiatrist diagnosed Plaintiff with a GAF of 35-40. (Pl.'s Br. at 10).

Although the ALJ is not required to discuss every piece of evidence in the record, an ALJ should discuss evidence that, if believed, could lead to a finding of disability. The ALJ is required to consider the applicant's medical situation as a whole. *See Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004). In reviewing the ALJ's decision, the Court must scrutinize the record in its entirety. *See Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992).

Plaintiff treated with Dr. Kaplan from August 23, 2001 to September 28, 2001. (TR 116). Contrary to Plaintiff's assertion, the ALJ considered this evidence and stated that Plaintiff "has a history of degenerative arthritis with complaints of bilateral knee pain, bilateral foot and ankle pain, . . . and lymphadema (sic)." (TR 18).

Plaintiff next argues that the ALJ failed to consider the Plaintiff's treating psychiatrist's diagnosis that Plaintiff has a GAF of 35-40. (Pl.'s Br. at 10). The ALJ did not err in failing to mention this score. First, although the ALJ did not expressly mention the GAF of 35-40, he cited extensively to the medical visit in which Plaintiff received that score, suggesting that he considered it. (TR 20). *See Hoelck v. Comm'r of Social Security*, 2008 WL 64705 (5th Cir. Jan. 7, 2008). Second, while it is well settled that the opinions and diagnoses of treating physicians are generally accorded substantial deference, there is no indication from the record that Dr. Sadasivan is a "treating physician" whose opinion is entitled to greater weight than that of Dr. Baddigam who diagnosed a GAF of 65. *See* 20 C.F.R. § 404.1527(d)(2). The Commissioner gives more weight to opinions from treating sources because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the medical impairment." 20 C.F.R. 404.1527(d)(2). Dr. Sadasivan's diagnosis was made at a single psychiatric evaluation on January 24, 2005 and there is no indication in the record that Dr. Sadasivan treated Plaintiff more than once. (TR 153). Dr. Sadasivan noted that Plaintiff "had not been getting treatment here in the past year other than for her arthritis . . . ." (TR 153). He also noted that "over the past 25 years she had not been seeing any psychiatrist." (TR 154). There is no indication that the ALJ failed to consider evidence in the record that could lead to a finding of disability.

***Whether the ALJ's Evaluation of Plaintiff's Mental Impairments is Supported by Substantial Evidence***

Plaintiff alleges that the ALJ's findings regarding Plaintiff's mental limitations are not supported by the record. The Commissioner prescribed rules for evaluating mental impairments. *See* 20 C.F.R. § 404.1520a and 416.920a. The Commissioner first determines whether there is a medically determinable mental impairment. Second, the Commissioner rates the degree of functional limitation resulting from the impairments. The rating is based on four broad functional areas: Activities of daily living, social functioning, concentration, persistence, or pace and episodes of decompensation. *See* 20 C.F.R. § 404.1520a(c)(3). Activities of daily living, social functioning and concentration, persistence and pace are rated on a five-point scale of "none, mild, moderate, marked and extreme." 20 C.F.R. § 404.1520a(c)(4). The fourth functional area, episodes of decompensation, uses a four-point scale: None, one or two, three, four or more." 20 C.F.R. § 404.1520a(c)(4). "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." 20 C.F.R. § 404.1520a(c)(4).

The ALJ addressed each of these areas in his opinion and cited Plaintiff's testimony and/or documentary evidence in support of each finding. First, the ALJ notes that the medical evidence established that Plaintiff has been diagnosed with post-traumatic stress disorder with psychotic features, dysthymic disorder, intermittent explosive disorder, avoidant personality disorder and possible bipolar disorder, however she does not have an impairment or combination of impairments that meets the Listing. (TR 22). Next, the ALJ made findings regarding the functional limitations of Plaintiff's impairments. He found that her ability to perform activities of daily living is only mild to moderately impaired, her social functioning is no more than mildly impaired, her ability to maintain focus and concentration is not impaired and her ability to undertake and complete tasks in a timely manner has "no significant impairment." (TR 21).

In the social functioning area, the ALJ cited to Plaintiff's reports that she gets along well with family, attends church regularly and is able to use public transportation. (TR 21, 82, 177). With regard to Plaintiff's ability to focus and maintain concentration, the ALJ cited Plaintiff's reports that she enjoys reading, visiting with friends and caring for her dogs. (TR 21, 78-85, 145). With regard to Plaintiff's ability to undertake and complete tasks in a timely manner, the ALJ specifically cites to Plaintiff's abilities to take care of herself and her dogs and complete household chores and activities of daily living. (TR 21, 78-85, 145).

The ALJ determined that there is no evidence that Plaintiff's mental impairment has "a significant impact on her ability to focus and maintain concentration." Plaintiff cites to a statement in Dr. Baddigam's report that "she has poor concentration," however this is in the "history" portion of the report and notes Plaintiff's subjective report of her condition. (TR 135). Within the same report, Dr. Baddigam notes that Plaintiff was "in touch with reality" and her "thinking process is well organized and easy to follow." (TR 135). He concluded that her "prognosis is guarded" and "she is able to manage her benefit fund." Although Dr. Sadasivan states that Plaintiff has "serious memory problems" he does not address Plaintiff's ability to concentrate or focus or the effect of her memory problems on the same. (TR 153).

Finally, the ALJ found that there is "no indication that the claimant has episodes of deterioration or decompensation in work or work-like settings." "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace." 20 C.F.R. Ch. 111, Pt. 404, Subpt. P, App. 1 12.00(C)(4). Plaintiff alleges that the ALJ's finding that Plaintiff does not have the RFC

to return to her prior work environment contradicts his finding that she had no episodes of decompensation. This is not an episode of decompensation. Episodes of decompensation "may be inferred from medical records showing significant alteration of medications; or documentation of the need for a more structure psychological support system," including hospitalization or placement in a halfway house. *Id.* The Court cannot equate a finding that Plaintiff lacks the RFC to perform her prior work to an episode of decompensation.

The ALJ's findings with respect to Plaintiff's mental impairments are supported by substantial evidence in the record. Even if substantial evidence would also support the opposite conclusion, the Commissioner's decision must be affirmed. *See Kinsella*, 708 F.2d at 1059; *Her*, 203 F.3d at 389-90.

***Whether the ALJ Complied with SSR 96-6p***

Plaintiff alleges that the ALJ failed to comply with SSR 96-6p which requires him to explain the weight he gave to the state consultant's psychiatric evaluation, performed June 25, 2004 by Dr. Baddigam. (TR 20, 135-37). Plaintiff states that "[s]ince there is no explanation as to how much weight was given that exam, it is impossible to determine how much damage was done to the Plaintiff regarding this error of law." (Pl.'s Br. at 18). The Regulations set forth detailed rules for evaluating medical opinions. *See* 20 CFR 404.1527 and 416.927. The regulations state that generally, the Commissioner gives more weight to the opinion of a source who has examined a claimant than to the opinion of a source who has not examined the claimant. 20 CFR 404.1527(d)(1) and 416.927(d)(1). Dr. Baddigam examined Plaintiff on June 25, 2004. (TR 135). While Plaintiff is correct that SSR 96-6p provides that the ALJ "may not ignore" the opinions of state agency medical and psychological consultants and "must explain the weight given to these opinions," SSR

96-6p applies to "medical opinions of nonexamining sources." SSR 96-6p. Even if SSR 96-6p applied to an examining consultant, the ALJ has complied with the requirements. The ALJ considered Dr. Baddigam's opinion and referred to it in his decision. The ALJ referenced Dr. Baddigam's diagnosis of intermittent explosive disorder and dysthymic disorder and the extent to which it was supported by Plaintiff's testimony and other documentary evidence when he found that Plaintiff's symptoms result in "no more than a mild to moderate impairment affecting her ability to perform her usual activities of daily living." (TR 21).

### *Whether the ALJ Complied with SSR 96-7p*

Plaintiff alleges that the ALL failed to comply with SSR 96-7p which requires him to explain credibility determinations. "[A]n ALL's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since the ALL is charged with the duty of observing a witness's demeanor and credibility. *Walters,* 127 F.3d at 531. However, credibility assessments are not insulated from judicial review. Despite deference due, such a determination must nevertheless be supported by substantial evidence. *Id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

The ALJ found that Plaintiff's "allegations of diabling symptoms of chronic bilateral knee and ankle pain and debilitating low back pan are not wholly credible because they are not supported by the objective clinical evidence or the claimant's reported activities of daily living." (TR 19). The ALJ then cites to specific reasons in the record for his credibility determinaion including x-rays of Plaintiff's knees revealing only an old and well-healed fracture, results of clinical evaluations

revealing good range of motion in her lower back and a range of motion in her knees which was not significantly decreased and the lack of an objective diagnostic evaluation of her complaints of lower back pain. (TR 19). The ALJ further points to Plaintiff's specific activities of daily living that do not support her complaints of pain. (TR 19). The ALJ provided specific reasons for finding Plaintiff's allegations not fully credible and the findings are supported by substantial evidence in the record.

***Whether the ALJ's Finding that Plaintiff Could Perform A Significant Number of Jobs in the Economy is Supported by Substantial Evidence.***

The ALJ properly determined Plaintiff's RFC based on all of the medical evidence of record and found that she could perform "the exertional and nonexertional requirements of sedentary work offering a simple routine in a low stress work environment (20 CFR 404.1545 and 416.945)." (TR 22). The ALJ properly referenced the regulations, Pt. 404, Subpt. P, App. 2, Rule 201.15 and 20 C.F.R. 404.1569 and 416.969 which would direct a conclusion of "not disabled" and further relied on the VE's testimony to determine what effect Plaintiff's non-exertional limitations would have on the number of jobs available in the economy[1]. (TR 23).

Plaintiff alleges that the ALJ disregarded the VE's testimony that if Plaintiff's emotional conditions "were severe enough that heard (sic) voices affecting her power of concentration, her ability to function and deal with even very low-end, even sem-skilled (sic), but low-end, semi-skilled or functions as [the VE] enumerated that would be present in these clerical jobs," Plaintiff would

---

[1]The ALJ makes a finding that Plaintiff is 49 years old and defined as a "younger individual" under 20 C.F.R. 404.1563 and 416.963. (TR 22). However, at the time of the decision, Plaintiff was 50 years old, defined as a person "closely approaching advanced age." This is harmless error because the ALJ properly references Rule 201.15 under the regulations, which considers a person "closely approaching advanced age." Pt. 404, Subpt. P, App. 2, Rule 201.15.

not be able to do them on a sustained full-time basis. (TR 195). However, in a hypothetical question posed to the vocational expert ("VE"), an ALJ is required to incorporate only those limitations which he finds credible and supported by the record. *See Casey v. Sec'y of Health and Human Serv.,* 987 F.2d 1230, 1235 (6th Cir. 1993). The ALJ found that Plaintiff's allegations were not wholly credible. (TR 22). The VE testified that Plaintiff had transferrable skills to light or sedentary work within the educational field, such as to attendance or records clerk and that there were approximately 7,500 of these jobs in the state and one-half that number in southeast Michigan at the sedentary level. (TR 192-93). The VE further testified that these were sit down jobs, however they had the flexibility of allowing one to stand up in these jobs and these jobs "would be potentially consistent with the physical limitations" described by Plaintiff, including her inability to "sit long." (TR 193, 195). The VE stated that these were not high-speed production jobs. (TR 194). The VE testified that the Dictionary of Occupational Titles would not limit these jobs to an educational setting, however, the VE had already addressed this distinction in her testimony. Based on substantial evidence, the ALJ did not err in determining Plaintiff's RFC. The ALJ's his finding that there are a significant number of jobs in the economy which Plaintiff can perform is supported by substantial evidence in the record including the VE's testimony.

**CONCLUSION**

The ALJ's opinion is supported by substantial evidence. Defendant's Motion for Summary Judgment (docket no. 13) should be denied, that of Plaintiff granted and the instant complaint dismissed.

**REVIEW OF REPORT AND RECOMMENDATION**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 31, 2008          s/ Mona K. Majzoub
                                 MONA K. MAJZOUB
                                 UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: January 31, 2008          s/ Lisa C. Bartlett
                                 Courtroom Deputy